CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

8/13/2018
JULIA C. DUDLEY, CLERK
BY:  s/ CARMEN AMOS
     DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | | |
|---|---|---|
| **LISA T.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 6:17-cv-39** |
| **v.** | ) | |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | **By: Hon. Robert S. Ballou** |
| **Acting  Commissioner of Social Security,** | ) | **United States Magistrate Judge** |
| | ) | |
| **Defendant.** | ) | |

### REPORT AND RECOMMENDATION

Plaintiff Lisa T. ("Lisa") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Specifically, Lisa alleges that the Administrative Law Judge ("ALJ"): (1) violated SSR 00-4p by relying on vocational expert testimony that was inconsistent with the Dictionary of Occupational Titles ("DOT"); (2) erred in giving little weight to the opinions of her treating physicians; (3) erred by failing to account for her manipulative limitations in the RFC; (4) erred by failing to consider whether she is entitled to a limited closed period of disability; and (5) improperly discounted her credibility. I conclude that substantial evidence supports the Commissioner's decision on all grounds. Accordingly, I **RECOMMEND DENYING** Lisa's Motion for Summary Judgment (Dkt. 11), and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 14).

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Lisa failed to demonstrate that she was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Lisa protectively filed for DIB on March 25, 2013. R. 143. Lisa claimed that her disability began on September 19, 2012. Id. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 86, 94. On February 17, 2016, ALJ Brian P. Kilbane held an administrative hearing to consider Lisa's disability claim. R. 41–63. Lisa was represented by an attorney at the hearing, which included testimony from Lisa and vocational expert James E. Ganoe. Id.

On March 25, 2016, the ALJ entered his decision analyzing Lisa's claim under the familiar five-step process,[3] and denying Lisa's claim for disability. R. 21–36. The ALJ found that

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform

Lisa suffered from the severe impairments of right foot dysfunction status post-surgery and peripheral neuropathy. R. 23. The ALJ further found that Lisa retained the RFC to perform light work with the following limitations: (1) she can lift and carry 20 pounds occasionally and 10 pounds frequently[4]; (2) she can stand and walk with normal breaks for four hours in an eight-hour workday and sit with normal breaks for six hours in an eight-hour workday; (3) she can never climb ladders, ropes, or scaffolds; (4) she should avoid concentrated exposure to extreme cold, vibration, and hazards; (5) she can frequently stoop, kneel, and crawl; (6) she can occasionally operate foot controls of pushing/pulling on the right; and (7) she can occasionally balance, crouch, and climb stairs. R. 24.

The ALJ determined that Lisa could not return to her past relevant work as a sales associate or stock clerk. R. 35. However, the ALJ determined that Lisa could perform jobs that exist in significant numbers in the national economy, such as ticket seller, garment sorter, and laundry worker/folder. R. 36. Thus, the ALJ concluded that Lisa was not disabled. Id.

Lisa appealed the ALJ's decision to the Appeals Council, but her request for review was denied. R. 1–3. This appeal followed.

## ANALYSIS

Lisa challenges the ALJ's decision on five grounds, arguing that the ALJ: (1) violated SSR 00-4p by relying on vocational expert testimony that was inconsistent with the DOT;

---

other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[4] The RFC set out in the opinion mistakenly stated that Lisa can lift 20 pounds frequently and 10 pounds occasionally. R. 24. During the administrative hearing, the ALJ asked the vocational expert whether an individual who could "occasionally lift or carry 20 pounds [and] frequently lift or carry 10 pounds." R. 57. I conclude that the ALJ intended the RFC outlined in the opinion to limit Lisa to lifting and carrying 10 pounds frequently and 20 pounds occasionally.

3

(2) erred in giving little weight to the opinions of her treating physicians; (3) erred by failing to account for her manipulative limitations in the RFC; (4) erred by failing to consider whether she is entitled to a limited closed period of disability; and (5) improperly discounted her credibility.

## SSR 00-4p

Lisa argues that the ALJ violated SSR 00-4p by relying on the vocational expert's "testimony that is inconsistent with the DOT and with the Social Security Definition of 'light work' without a reasonable explanation." Dkt. 12, at 6.

At Step Five of the sequential evaluation, the ALJ must determine whether, considering the claimant's age, education, and work experience, the claimant is capable of performing other jobs existing in substantial numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). In making findings at Steps Four and Five, an ALJ may rely on the testimony of a vocational expert, who is to use the DOT to identify the jobs the claimant can perform in terms of the exertional, non-exertional, and mental activities they require. SSR 00-4p. Furthermore, the ALJ has a duty to identify any apparent conflicts between the vocational expert's testimony and the DOT. Id. ("When there is an apparent unresolved conflict between [vocational expert] . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] . . . evidence to support a determination or decision about whether the claimant is disabled.").

When confronted with an apparent conflict between the vocational expert's testimony and the DOT, the ALJ must "[i]dentify *and* obtain a reasonable explanation for the conflict[]." Pearson v. Colvin, 810 F.3d 204, 208 (4th Cir. 2015). The vocational expert's "'experience in job placement or career counseling' [constitutes a] reasonable bas[is] for relying on the evidence

from such an expert rather than the DOT." Corder v. Colvin, No. 1:14CV768, 2015 WL 4508418, at *3 (M.D.N.C. July 24, 2015) (quoting SSR 00-4p).

Light work as classified by the DOT requires: (1) lifting and carrying twenty pounds occasionally and ten pounds frequently; (2) "a good deal of walking or standing"; or (3) "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). These are the maximum requirements for light work, not the minimum. See SSR 00-4p ("The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A [vocational expert] . . . or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.").

The ALJ restricted Lisa to light work with the additional limitations of standing and walking for four hours in an eight-hour workday and sitting for six hours in an eight-hour workday, both with normal breaks. R. 24. The vocational expert stated that with such an RFC, an individual can work jobs such as ticket seller, garment sorter, and laundry worker/folder, which are "light work" positions under the DOT. R. 58–59. However, the vocational expert explained that, in his experience, a person with Lisa's RFC would be able to work about 50 percent of these open positions. R. 58.

Once the vocational expert identified that Lisa could work light jobs in the regional and national economy, the ALJ identified a conflict between the vocational expert's testimony and the DOT definition of "light work." R. 59. The ALJ asked the vocational expert to explain the conflict, and the vocational expert replied that in his experience, a person limited to standing four hours in a day could work about half of the available jobs in ticket selling, garment sorting, and laundry folding. R. 59. The ALJ may rely on the vocational expert's experience to resolve a

conflict between the DOT and the jobs identified by the vocational expert. See SSR 00-4p; see also Bratton v. Astrue, No. 2:06-0075, 2010 WL 2901856, at *3–4 (M.D. Ten. July 19, 2010) (ALJ did not err in finding that Plaintiff could perform light work with a four-hour walking limitation). The ALJ properly identified a potential conflict between the DOT and the vocational expert testimony and had the vocational expert resolve this conflict. Therefore, I find that the ALJ committed no error in relying on the vocational expert's testimony.

**Medical Opinions**

Lisa argues that the ALJ erred in giving little weight to the opinions of her treating physicians, Charles Zelen, M.D., and Peter Konieczny, M.D., who concluded that her diabetes, foot dysfunction and neuropathy would require significant limitations involving sitting, standing, walking, manipulation, and that she would miss work frequently.

Lisa has a complicated history of diabetes, both prior to and during the relevant period. Lisa testified that her diabetes caused nerve damage and bone deterioration. R. 25. This degeneration led to numerous other medical problems, primarily with her right foot.

In September 2012, Lisa saw Robert Feldman, DPM, and reported pain and swelling in her right foot starting two weeks prior. R. 216. Lisa described the pain as moderate, but exacerbated by standing and walking. Id. Dr. Feldman placed Lisa in a pneumatic CAM walker due to the possibility of a stress fracture or Charcot foot[5]. R. 217. Dr. Feldman wrote a note excusing Lisa from work for up to twenty weeks. Id.

---

[5] "Charcot foot is a condition causing weakening of the bones in the foot that can occur in people who have significant nerve damage (neuropathy). The bones are weakened enough to fracture, and with continued walking, the foot eventually changes shape. As the disorder progresses, the joints collapse and the foot takes on an abnormal shape, such as a rocker-bottom appearance." Charcot Foot, Foot Health Facts, https://www.foothealthfacts.org/conditions/charcot-foot (foothealthfacts.org is the official consumer website of the American College of Foot and Ankle Surgeons).

At her follow up appointment in October 2012, Dr. Feldman found swelling and tenderness with palpation in Lisa's right foot. R. 219. Lisa underwent an MRI, which revealed some edema and a possible stress fracture, but no abscesses. R. 228–30. Dr. Feldman explained that the MRI showed a "likely stress reaction or neuropathic process which is consistent with a Charcot foot." R. 220. Dr. Feldman placed Lisa in a Charcot restraint orthotic walker ("CROW"), and advised her to wear it for sixteen weeks. R. 221.

In mid-November 2012, Lisa told Dr. Feldman that the CROW was comfortable and that she experienced less pain and swelling in her right foot. Id. Dr. Feldman explained that "the CROW walker fits very well" and that he will keep Lisa in it for 12 to 16 weeks before scheduling another MRI. R. 223. Dr. Feldman advised Lisa to keep weight off her right foot. Id.

Lisa returned to Dr. Feldman in mid-January 2013, after wearing the CROW for the last four months. R. 224. Lisa reported feeling better overall, but still experienced pain and swelling in her right foot, with additional pain on the ball of her left foot. Id. Dr. Feldman recommended that Lisa take over-the-counter pain medication for the pain in her left foot, avoid activities which would exacerbate the pain, and use a diabetic insole. R. 225. Lisa underwent an MRI on January 29, 2013, which showed neuropathic arthropathy which had progressed since October 2012. R. 231. Dr. Feldman referred Lisa to Charles Zelen, DPM, to explore continued use of the CROW or surgery. R. 227.

Lisa saw Dr. Zelen for the first time in February 2013. R. 404–06. Dr. Zelen found Lisa's sensation to sharp, dull, and light touch intact. R. 404. X-rays showed a fracture causing pain which was "less than expected." Id. Dr. Zelen diagnosed Lisa with diabetic neuropathy, Charcot foot with midfoot fracture and Lisfranc injury, and equinus. Id. Dr. Zelen and Lisa agreed to surgery. R. 405.

In March 2013, Lisa saw Patricia H. Hayes, FNP, for a pre-surgical visit. R. 317–20. She had normal strength, reflexes, and sensation in her lower extremities, and was cleared for surgery later that month. Id.

On April 19, 2013, Lisa underwent a multiple midfoot fusion to the right foot, tendo-achilles lengthening to the right ankle, and an application of multiplane external fixator to the right foot and ankle, which she tolerated well. R. 407–08. Lisa received antibiotics and pain medications after the surgery. R. 349. Lisa's family physician, Janice E. Luth, M.D., started her on home health care treatment for diabetic and pain management. R. 421–22. Lisa was determined to have fair rehabilitation potential. R. 422.

On May 1, 8, 15, and 22, 2013, Nathan Young, DPM, found minimal edema, the surgery staples in place, and intact sensation to sharp, dull, and light touch, and continued Lisa on post-operative medications. R. 394, 396, 398, 400. On May 1, 2013, Dr. Young changed Lisa's dressings and stated that she "may touchdown weight bearing on the frame for transfers." R. 400. On May 15, 2013, Dr. Young explained "that [Lisa's] pain is well controlled and hasn't required any of her pain medication" and that she is "feeling better now that she has finished the medications that she was placed on when she was discharged from the hospital and feels more like herself." Id. On May 29, 2013, Lisa stated that the pain is well controlled and that "[s]he feels well." R. 392.

Lisa saw Dr. Young on June 5 and 12, 2013, and physical examination showed that her sensation to sharp, dull, and light touch were intact, proprioception was intact, protective threshold was intact, surgical wounds were "well coapted," staples were in place, no happing or dehiscences noted, minimal edema, no erythema, no ecchymosis, no drainage, and the wires and pins were in place with good tension. R. 388, 390. Dr. Young prescribed aspirin. R. 390. An X-

ray of her right foot and leg on June 19, 2013 showed "no malalignment of the bones of the foot." R. 409. Lisa saw family medicine doctor Todd H. Dehli, M.D., for a check-up on June 24, 2013, who explained that she had very little swelling in her right foot, does not tolerate exercise well, experienced pain exacerbated by moving, but has normal strength and sensation. R. 300–02. Lisa returned to Dr. Young on June 26, 2013, reporting that she felt well and that her pain was well-controlled. R. 384. Dr. Young cleared Lisa for the removal of the frame keeping her right foot aligned after surgery. Id.

Lisa returned to Dr. Zelen on July 1, 2013, and explained that her pain was controlled. R. 383. Dr. Zelen found normal objective findings with minimal edema, and instructed Lisa to continue her current medications and not to place weight on her right foot. Id. On August 14, 2013, Dr. Zelen authorized Lisa to walk in a CAM boot and start physical therapy. R. 379.

Lisa did not see Dr. Zelen again until September 2013. R. 439. Lisa explained that her foot was feeling better and her pain was controlled. Id. She had a normal physical examination. Dr. Zelen directed Lisa to start physical therapy and to transition from her CAM boot to tennis shoes. Id.

Lisa returned to Dr. Dehli in October 2013. R. 417–19. On examination, Lisa had normal posture and gait, and no edema in her right foot. R. 418–19. Lisa saw Dr. Zelen later that month, and reported that her right foot was sore. R. 441. Dr. Zelen found that Lisa's sensation to touch in her right foot was diminished. Id. Dr. Zelen reduced the strength of Lisa's pain medication, directed her to start physical therapy, and directed her to progress to tennis shoes. Id.

Lisa returned to Dr. Zelen in November 2013, reporting that her pain was controlled, she was walking with tennis shoes and a brace, and was overall "doing well." R. 443. Dr. Zelen found diminished sensation in Lisa's right foot and minimal edema, but he also found good

muscle strength, full range of motion, and a "well maintained" arch in her foot. Id. Dr. Zelen

noted that Lisa will wear tennis shoes with gel inserts, and that she elected to do physical therapy

at home with her husband. Id.

Lisa followed up with Dr. Zelen in December 2013, and reported that her right foot was

sore and required her to wear the CAM boot. R. 445. Dr. Zelen noted that Lisa is moving in

tennis shoes with a brace and is doing well overall. Id. Dr. Zelen instructed Lisa to stop using the

CAM boot for the next six weeks and wear tennis shoes. R. 445.

Lisa returned to Dr. Zelen in late January 2014, reporting right foot soreness that is

continually getting better every month. R. 447. Dr. Zelen found diminished sensation in Lisa's

right foot and minimal edema, but he also found good muscle strength, full range of motion, and

a "well maintained" arch in her foot. Id. Dr. Zelen reported that Lisa stopped using the CAM

boot completely and only wore tennis shoes. Id. Dr. Zelen stated that he "expect[s Lisa] to make

[continuing] good progress." Id. Lisa did not seek any other medical treatment for her foot for six

months.

Lisa saw Dr. Zelen again in July 2014, and reported occasional but controlled pain.

R. 449. Dr. Zelen stated that the pain "is normal and will continue to subside over time." Id. Dr.

Zelen stated that Lisa was ready to transition to orthotics. Id. Dr. Zelen's physical examination

showed minimal edema, diminished sensation, full range of motion, good strength, and a well-

maintained arch. Id. Lisa was walking in tennis shoes with a brace and "doing well." Id.  Lisa did

not see a doctor for her foot again during the relevant period.

On January 24, 2016, Dr. Zelen gave the opinion that Lisa can sit for eight hours and

stand and walk for one hour in an eight-hour work day. R. 455. Dr. Zelen stated that Lisa can

only sit, stand, and walk for fifteen minutes at a time without changing her position. Id. Dr. Zelen

explained that Lisa can never lift and carry anything over ten pounds; can never bend, squat,

crawl, climb, stoop, and kneel; and can only occasionally reach above her head.  R. 456–57. Dr.

Zelen stated that Lisa is limited with simple grasping and fine manipulation in her hands. R. 456.

Dr. Zelen explained that Lisa can never be exposed to unprotected heights, be around moving

machinery, or be exposed to dust, fumes, gases, smoke, or perfumes. R. 457. However, Dr. Zelen

explained that Lisa could continuously be exposed to noise and can occasionally drive

automotive equipment and be exposed to marked changes in temperature. Id. Dr. Zelen stated

that Lisa experiences moderate chronic pain which would cause her to frequently take breaks and

miss work frequently. R. 458. The ALJ gave Dr. Zelen's opinion little weight. R. 34.

Lisa saw Peter Konieczny, M.D., once during the relevant period, on January 26, 2016.

R. 501. Lisa stated she visited Dr. Konieczny to "obtain more information about [her] nerves

before [she] appear[s] before the judge in February." Id. Dr. Konieczny diagnosed Charcot foot

and peripheral neuropathy. R. 503. Regarding Lisa's Charcot foot, Dr. Konieczny explained that

she "demonstrates an antalgic gait," has limited range of motion in her right foot, and

"undoubtedly" experiences difficulty with walking and standing. Id. Regarding Lisa's peripheral

neuropathy, Dr. Konieczny explained that she "very likely has a sensorimotor peripheral

neuropathy affecting the lower and upper extremities. This is undoubtedly of chronic duration

with evidence of trophic changes to her skin involving both feet and hands." Id. The ALJ gave

Dr. Konieczny's opinion little weight. R. 35.

On March 17, 2014, at the initial level of administrative review, Richard Surrosco, M.D.,

stated that Lisa is limited to lifting and carrying twenty pounds occasionally and ten pounds

frequently. R. 70. Dr. Surrosco explained that Lisa can stand and walk for four hours in an eight-

hour workday and sit for six hours in an eight-hour workday. Id. Dr. Surrosco stated that Lisa is

limited in her ability to push and pull with her right lower extremities. Id. Dr. Surrosco explained

that Lisa can frequently stoop; can occasionally balance, crouch, crawl, and climb ramps and

stairs; but can never climb ladders, ropes or scaffolds. R. 70–71. Dr. Surrosco stated that Lisa has

no manipulative limitations. R. 71. Dr. Surrosco explained that Lisa should avoid concentrated

exposure to extreme cold, vibration, and hazards such as machinery and heights. Id. On

September 24, 2014, Tony Constant, M.D., concurred with Dr. Surrosco's findings at the

reconsideration level, but stated that Lisa can frequently, not occasionally, crawl. R. 81. The ALJ

gave both Drs. Surrosco's and Constant's opinions great weight. R. 33

A treating physician is a physician that has an "ongoing treatment relationship" with the

claimant. 20 C.F.R. § 404.1527(a)(2). An ongoing treatment relationship is established when the

"medical evidence establishes that you see, or have seen, the source with a frequency consistent

with the accepted medical practice for the type of treatment and/or evaluation required for your

medical conditions." Id. An ongoing treatment relationship is not established if the claimant saw

the physician less than "a few times" or after excessively "long intervals." Id. Additionally, if the

claimant sought the medical opinion solely to obtain a report for a disability, an ongoing

treatment relationship does not exist. Id. If an ongoing treatment relationship does not exist but

the physician actually examined the claimant, the examining physician is still given more weight

than the medical opinion of a non-examining physician. 20 C.F.R. § 404.1527(c)(1).

A treating physician's opinion which is "well-supported by medically acceptable clinical

and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in

[the] case record" will receive controlling weight. 20 C.F.R. § 404.1527(c)(2). The ALJ must

give "good reasons" for not affording controlling weight to a treating physician's opinion. Id.;

Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 256 (4th Cir. 2017). Further, if the ALJ

determines that a treating physician's medical opinion is not deserving of controlling weight, the

following factors must be considered to determine the appropriate weight to which the opinion is

entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of

the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's

consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R.

§ 404.1527(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in

weighing the value of a treating physician's opinion." Ricks v. Comm'r Soc. Sec. Admin., No.

2:09-cv-622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citing Burch v. Apfel, 9 Fed.

Appx. 255, 259 (4th Cir. 2001) (per curiam)).

The Fourth Circuit reiterated in Monroe v. Colvin that an ALJ must "build an accurate

and logical bridge from the evidence to his conclusion," and the failure to do so is grounds for

remand. 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th

Cir. 2000)). "The failure of an ALJ to specify what treatment history or evidence does not

support a particular opinion means 'the analysis is incomplete and precludes meaningful

review.'" Knapp v. Colvin, No. 7:15-CV-348, 2016 WL 4447836, at *3 (W.D. Va. Aug. 1, 2016)

(quoting Monroe, 826 F.3d at 191), report and recommendation adopted, No. 7:15-CV-00348,

2016 WL 4482419 (W.D. Va. Aug. 23, 2016). Monroe confirms the ALJ's obligation to explain

the conclusions reached and identify the record evidence which supports those conclusions. Only

then can a court meaningfully review whether substantial evidence supports the ALJ's decision.

Substantial evidence supports the ALJ's decision to give little weight to Drs. Zelen and

Konieczny and great weight to the opinions of the state agency physicians. The ALJ explained

that Dr. Zelen's restrictive opinion limiting Lisa to only 15 minutes of standing at a time for a

total of one hour in an eight-hour workday appeared to be based on Lisa's subjective complaints.

R. 34. The ALJ explained that the standing and walking limitations from Drs. Zelen and

Konieczny are inconsistent with the objective medical evidence, which shows a steady decrease

in pain since the April 2013 surgery. In many instances, Lisa explained that her foot was feeling

better and was improving with each passing month. Dr. Zelen explained multiple times that Lisa

was doing well overall, that her pain was steadily subsiding, that she had good strength, full

range of motion, and a well-maintained arch. Indeed, in the ensuing months after her surgery, Dr.

Zelen decreased Lisa's pain medication, transitioned her from a CAM boot to tennis shoes

coupled with gel inserts and a brace, and cleared her for physical therapy.

Additionally, the ALJ explained that nothing in the record supports Dr. Zelen's

environmental limitations or lifting and carrying limitations. The record is devoid of any

objective medical evidence indicating that Lisa is incapable of being exposed to heights,

machinery, or gases, smoke, and fumes. Additionally, Lisa alleged no ailments associated with

her upper body, as the crux of her medical treatment during the relevant period focused on her

diabetic neuropathy and Charcot foot. No evidence in the record supports Dr. Zelen's opinion

that Lisa could never lift and carry more than ten pounds, and could lift and carry ten pounds

only occasionally.

Regarding Dr. Konieczny's opinion, the ALJ noted that he saw Lisa only once during the

relevant period, and provided only general limitations. Dr. Konieczny stated that Lisa's April

2013 surgery limited her range of motion in her right foot which "undoubtedly makes ambulation

difficult and would make prolonged standing likely difficult," but this conclusion conflicts with

the findings of Lisa's treating physicians that she had full range of motion and Dr. Konieczny's

note that she walks without a cane. R. 501, 503. The ALJ gave little weight to Dr. Konieczny's

opinion because Dr. Konieczny had a limited treatment history with Lisa, gave limited analysis

to explain his opinion, and imposed restrictions which were inconsistent with the objective medical evidence.

The ALJ gave great weight to the state agency physicians, noting that despite not examining Lisa, their opinions "are generally consistent with [her] positive response to foot surgery with progressive improvements over time." R. 33. The ALJ found that the opinions of the state agency physicians adequately accounted for Lisa's residual foot soreness stemming from her Charcot foot while simultaneously accounting for her steady improvement after her surgery, as the state agency physicians explained that Lisa could stand and walk only four-hours in an eight-hour work day—less than the maximum for light work. The ALJ concluded that the state agency medical physicians imposed limitations that are consistent with Lisa's improvements from surgery, "her few neuropathic signs on exam, her generally full strength throughout [the relevant period], and her limited foot and neuropathy treatment after surgery." R. 33.

The ALJ laid out Lisa's medical history in detail, explained the opinions of both her treating physicians and the state agency medical physicians, and ultimately ruled that the opinions of her treating physicians were inconsistent with the objective medical evidence while the opinions of the state agency medical physicians were not. Substantial evidence supports the weight given to the opinions of Drs. Constant and Surrosco and the conclusion to give less weight to the opinions of Drs. Zelen and Konieczny.

**<u>Manipulative Limitations</u>**

Lisa claims that "[t]he ALJ erred in his residual functional capacity assessment in failing to account for manipulative limitations posed by the claimant's peripheral neuropathy in her hands." Dkt. 12, at 13.

An RFC is the most a claimant can do despite his or her limitations. 20 C.F.R.

§ 404.1545(a)(1). In crafting a claimant's RFC, the ALJ will evaluate all medically determinable

impairments that the ALJ is aware of from the record, including those that are not severe. 20

C.F.R. § 404.1545(2). The ALJ's RFC determination must be upheld if it is supported by

substantial evidence. Stevens v. Colvin, No. 6:14–cv–00021, 2015 WL 5510928, at *20 (W.D.

Va. Sept. 16, 2015) (citing Craig, 76 F.3d at 589) (upholding ALJ's decision because substantial

evidence supported the physical RFC determination).

Lisa relies on the opinions of Drs. Konieczny and Zelen to argue that the ALJ failed to

include manipulative limitations in the RFC. Dkt. 12, at 13–14. Dr. Konieczny stated that Lisa

suffers from "sensorimotor peripheral neuropathy affecting the upper and lower extremities" and

"trophic skin changes." R. 503. Dr. Zelen stated that Lisa would be limited in grasping and fine

manipulation in both hands. R. 456. Lisa points to no objective medical evidence indicating that

she suffers from impairments that restrict her ability to grasp and manipulate.

The ALJ gave little weight to the opinions of Drs. Konieczny and Zelen, explaining that

the opinions were unsupported by the objective medical evidence that showed Lisa's steady

improvement after surgery, and were therefore based on her subjective complaints. As neither

Lisa, Dr. Zelen, nor Dr. Konieczny identified any objective medical evidence indicating that Lisa

is indeed limited in her ability to grasp and manipulate, the ALJ committed no error in omitting

such a restriction in the RFC determination. I find that substantial evidence supports the ALJ's

decision to exclude manipulative limitations from Lisa's physical RFC.

## Limited Closed Period of Disability

Lisa argues that the ALJ failed to consider whether she is entitled to a limited closed

period of disability. Specifically, Lisa claims that she met the listed impairment for major

16

dysfunction of a joint from September 19, 2012 through December 2014, and is therefore entitled to almost 27 months of disability benefits. Dkt. 12, at 14–15.

An individual need not be permanently disabled to acquire SSI or DIB; an individual is entitled to benefits if he or she is disabled for a continuous twelve-month period between the alleged onset date and the administrative hearing date. See Puryear v. Comm'r of Soc. Sec., No. 4:15–cv–00057, 2016 WL 462822, at *6 (W.D. Va. Jan. 5, 2016). The ALJ is required to evaluate the record for any continuous twelve-month period of disability, and failure to do so may warrant remand. See id. (citing Miller v. Comm'r of Soc. Sec., No. 13 Civ. 6233, 2015 WL 337488, at *24 (S.D.N.Y. Jan. 26, 2015); Reynoso v. Astrue, No CV 10–04604, 2011 WL 2554210, at *5–7 (C.D. Cal. June 27, 2011); and Dounley v. Comm'r of Soc. Sec. Admin., No. 3:08cv1388, 2009 WL 2208021, at *8–9 (N.D. Tex. July 22, 2009)).

At the third step of the sequential evaluation, the ALJ must compare the claimant's symptoms "to a list of impairments presumed severe enough to preclude any gainful work." Sullivan v. Zebley, 493 U.S. 521, 525 (1990) (citing 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (1989)). If the claimant's symptoms match with a listed impairment, the claimant is deemed disabled and immediately qualifies for benefits. See id. (citing 20 C.F.R. § 416.920(d)).

One such listing is listing 1.02: major dysfunction of a joint(s) (due to any cause). 20 C.F.R. pt. 404, subpt. P, App. 1, § 1.02. This listing is characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With . . . [i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, App. 1, § 1.02A. The inability to ambulate effectively means the claimant has "insufficient lower extremity functioning to permit independent ambulation without the use of a handheld assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, App. 1, § 1.00B2b(1). Examples of ineffective ambulation include "the inability to walk without the use of a walker, two crutches or two canes," and the inability to do standard activities of daily life such as shopping and banking. 20 C.F.R. pt. 404, subpt. P, App. 1, § 1.00B2b(2).

The ALJ explained that Lisa does not meet a listed impairment entitling her to immediate benefits under 20 C.F.R. pt. 404, subpt. P, App. 1. The ALJ stated that "[s]pecific attention was paid to section 1.02," and explained that "[n]o treating or examining physician has identified medical signs or findings that meet or medically equal the requirements of [section 1.02]" R. 24.

Lisa points to no objective medical evidence supporting her claim that she met listed impairment § 1.02. Indeed, the record is devoid of any medical evidence indicating that a major weight-bearing joint proved problematic during the relevant period. The record reflects that Lisa's surgery was successful, as her pain decreased steadily while her mobility improved steadily. Lisa never "ambulated ineffectively," as no doctor prescribed her an assistive ambulatory device that limited the functions of her hands and arms. In fact, in September 2013— a mere five months after her surgery—Lisa was directed to start physical therapy and transition from a CAM walking boot to tennis shoes. Lisa's ability to walk was most affected by the April 2013 surgery on her right foot and ankle The ALJ stated that after the surgery:

> she reported improved pain over time, such that she eventually did
> not require pain medications, and she had minimal edema on exam
> [in May 2013]. [Lisa] reported feeling well with well-controlled
> pain and little swelling in June 2013, and as her x-rays from that
> month showed no foot bone mal-alignment, her external fixator
> frame was removed in late June 2013. From July to December

> 2013, [Lisa] reported improved right foot pain; she had full range
> of motion with good muscle strength on exam; she was cleared to
> use a CAM boot, then eventually tennis shoes with gel insoles and
> a gel brace; she opted to do home [physical therapy]; and she was
> tapered off Dilaudid. In fact, [Lisa] denied using the CAM boot by
> January 2014, and she was not seen again by podiatry until July
> 2014, where her most recent x-rays were noted as showing a solid
> fusion with only mild joint degeneration. [Lisa] has no lower
> extremity edema at her September 2014 to December 2015 family
> medicine visits, and at her January 2015 neurology check-up, she
> walked without a cane, she had normal coordination and motor
> tone, and she had intact ankle sensation bilaterally, despite an
> antalgic gait with limited right ankle movement.

R. 32.

Lisa fails to prove that she met a listing under § 1.02 and is entitled to a closed period of disability from September 2012 to December 2014, and the ALJ's opinion is therefore supported by substantial evidence.

**"Credibility"**

Lisa claims that the ALJ failed to conduct a proper "credibility"[6] analysis.

The ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and the ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). A claimant's subjective allegations of disabling symptoms and impairments are not conclusive on

---

[6] In March 2016, the Social Security Administration superseded its policy on assessing the credibility of a claimant's statements, and ruled that "credibility" is not appropriate terminology to be used in determining benefits. See SSR 16-3p, 2016 WL 1119029 (S.S.A. Mar. 16, 2016). "[W]e are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." SSR 16-3p at *1. "In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character." Id. Thus, under SSR 16-3p, the ALJ is no longer tasked with making an overarching credibility determination and instead must assess whether the claimant's subjective symptom statements are consistent with the record as a whole.

Here, SSR 16-3p was issued after the ALJ's consideration of Lisa's claim, and both the ALJ's opinion and the parties' briefs speak in terms of a "credibility" evaluation. Accordingly, I will analyze the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility. See Keefer v. Colvin, No. CV 1:15-4738-SVH, 2016 WL 5539516, at *11 (D.S.C. Sept. 30, 2016); Ford v. Colvin, No. 2:15-CV-05088, 2016 WL 5171986, at *5 (S.D. W. Va. Sept. 21, 2016); Hose v. Colvin, No. 1:15CV00662, 2016 WL 1627632, at *5 (M.D.N.C. Apr. 22, 2016).

their own; rather, subjective complaints and statements of symptoms, like all other evidence of

disability, are considered in the context of the record as a whole. See 20 C.F.R. §§ 404.1529,

416.929 (2014). The ALJ must first determine if the claimant suffers from a medical impairment

"which could reasonably be expected to produce the pain or other symptoms alleged." Id. If such

an impairment exists, the ALJ must then determine the consistency of the claimant's subjective

allegations by evaluating the claimant's medical history, medical signs, laboratory findings,

objective medical evidence of pain, and "any other evidence relevant to the severity of the

impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain,

and any medical treatment taken to alleviate it." Craig, 76 F.3d at 595 (citations omitted). If a

claimant's statements are inconsistent with other evidence, the ALJ may find that the claimant's

statements are overall outweighed by that other evidence after weighing both accordingly. See

SSR 16-3p.

Lisa indicated on her function report that she is completely debilitated, explaining that

she has "to have help for everything." R. 177. Lisa alleges an inability to do any chores, prepare

meals, care for her personal hygiene, drive, shop, walk, and do most physical activities besides

using her hands. R. 170–75. The ALJ explained that Lisa's claims of complete disability were

inconsistent with the objective medical evidence of record. The record reflects that Lisa

improved steadily since her April 2013 surgery, and was consistently reporting a decrease in pain

and an increase in mobility. Lisa was directed to start physical therapy four months after surgery

and wear tennis shoes within five months of surgery. Lisa's pain decreased so much that six

months after surgery, Dr. Zelen decreased her pain medication. In the months after surgery, Lisa

reported that she was overall feeling well with well-controlled pain.

I must give great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). I find that the ALJ's determination of the consistency of Lisa's statements regarding the severity of her symptoms in light of the objective medical evidence is supported by substantial evidence.

## **RECOMMENDED DISPOSITION**

It is not the province of the court to make a disability determination. The court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion. The ALJ properly considered all of the objective and subjective evidence in adjudicating Lisa's claim for benefits and in determining that her physical impairments would not significantly limit her ability to do a range of light work. Accordingly, I recommend that the Commissioner's decision be affirmed, the defendant's motion for summary judgment be **GRANTED**, and Lisa's motion for summary judgment be **DENIED**.

The Clerk is directed to transmit the record in this case to Norman K. Moon, Senior United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of

such objection.

Enter:  August 13, 2018

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge